**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| FIREARM OWNERS AGAINST CRIME; KIM STOLFER; JOSHUA FIRST; AND HOWARD BULLOCK, | : | No. 29 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court dated |
| Appellees | : | September 12, 2019, |
| | : | reconsideration denied October 23, |
| | : | 2019, at No. 1434 CD 2018 |
| v. | : | Affirming in Part & Reversing in Part |
| | : | the Order of the Dauphin County |
| | : | Court of Common Pleas, Civil |
| CITY OF HARRISBURG MAYOR ERIC | : | Division, dated October 9, 2018 at |
| PAPENFUSE; AND POLICE CHIEF | : | No. 2015-CV-354-EQ. |
| THOMAS CARTER, | : | |
| | : | ARGUED: December 1, 2020 |
| Appellants | : | |

## OPINION

**JUSTICE MUNDY**                                                    **DECIDED: October 20, 2021**

In this appeal by allowance, we consider whether the Commonwealth Court erred in concluding that Firearm Owners Against Crime (FOAC), Kim Stolfer, Joshua First, and Howard Bullock (collectively, Appellees) had individual and associational standing to challenge four of the City of Harrisburg's ordinances regulating firearms: the Discharge, Parks, Lost/Stolen, and Minors Ordinances. We affirm the Commonwealth Court because we conclude Appellees have standing to bring this declaratory judgment action before the City enforces the challenged ordinances against them.

# I. FACTUAL AND PROCEDURAL HISTORY

On January 16, 2015, Appellees filed a complaint for declaratory judgment and injunctive relief[1] against the City of Harrisburg, Mayor Eric Papenfuse, and Police Chief Thomas Carter (collectively, City) in the Court of Common Pleas of Dauphin County seeking to have the following Codified Ordinances of Harrisburg ("Code") declared unconstitutional and statutorily preempted:

> The "Discharge Ordinance," Code Section 3-345.2 - originally adopted in 1821 - which restricts the discharge of firearms within the City of Harrisburg to firing ranges in educational institutions accredited by the Pennsylvania Department of Education and approved by either the Mayor or Harrisburg Police Chief or a firing range operated by the Bureau of Police;[2]

> The "Parks Ordinance," Code Section 10-301.13 - originally adopted in 1905 - which prohibits the possession and discharge of firearms within City parks;[3]

---

[1] As we are reviewing rulings on preliminary objections contesting Appellees' standing, we take as true all material facts pled in the complaint and any reasonable inferences deduced therefrom. *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013).

[2] The Discharge Ordinance provides:

> No person shall fire any cannon, gun, rifle, pistol, toy pistol, or firearms of any kind within the City, except at supervised firing ranges in bona fide educational institutions accredited by the Pennsylvania Department of Education and with the approval of the Mayor or Chief of Police, or at a firing range operated by the Bureau of Police.

Code § 3-345.2. The Code provides this is a summary offense, subject to a fine of $50.00 to $1,000.00 and up to 90 days' imprisonment. Code §§ 3-345.99, 3-399.

[3] The Parks Ordinance provides, in relevant part:

> A. No person shall hunt, trap or pursue wildlife in any park at any time, except in connection with bona fide recreational

The "Minors Ordinance," Code Section 3-245.1 - originally adopted in 1951 - which makes it unlawful for unaccompanied minors under the age of 18 to possess firearms outside of their residences in the City of Harrisburg;[4]

The "State of Emergency Ordinance," Code Section 3.355.2(A)(1) - originally adopted in 1969 - which prohibits the sale, transfer, or purchase of firearms or ammunition during the period of emergency declaration by the Mayor and further authorizes the Mayor to prohibit the public possession of firearms during such a state of emergency;[5] and

activities and with the approval of the Director by general or special order or rules or regulations.

B. No person shall use, carry or possess firearms of any description, or air rifles, spring guns, bow and arrows, slings or any other form of weapons potentially inimical to wildlife and dangerous to human safety, or any instrument that can be loaded with and fire blank cartridges, or any kind of trapping device in any park.

C. No person shall shoot or propel any object from any of the foregoing into park areas from beyond park boundaries or while in a park.

Code § 10-301.13(A)-(C) (footnote omitted). A person who violates the Parks Ordinance is subject to a citation pursuant to Pa.R.Crim.P. 51, a fine of up to $1,000.00, and up to 90 days' imprisonment. Code §§ 10-301.99, 1-301.99.

[4] The Minors Ordinance provides:

It shall be unlawful for any minor under the age of 18 years to have in his or her possession, except in his or her place of residence, any firearm, flobert rifle, air gun, spring gun or any implement which impels with force a metal pellet of any kind, unless said minor is accompanied by an adult.

Code § 3-345.1. The Code provides this is a summary offense, subject to a fine of $50.00 to $1,000.00 and up to 90 days' imprisonment. Code §§ 3-345.99, 3-399.

[5] The State of Emergency Ordinance provides, in relevant part:

A. Whenever the Mayor declares that a state of emergency exists, the following emergency prohibitions shall thereupon

The "Lost/Stolen Ordinance," Code Section 3.345.4 - originally adopted in 2009 - which requires firearms owners to report lost or stolen firearms to law enforcement within 48 hours of discovery of the loss or theft.[6]

be in effect during the period of said emergency and throughout the City:

>(1) The sale or transfer of possession, with or without consideration, the offering to sell or so transfer and the purchase of any ammunition, guns or other firearms of any size or description.

>(2) The displaying by or in any store or shop of any ammunition, guns or other firearms of any size or description.

>(3) The possession in a public place of a rifle or shotgun by a person, except a duly authorized law enforcement officer or person in military service acting in an official performance of his or her duty.

B. The Mayor may order and promulgate all or any of the following emergency measures, in whole or in part, with such limitations and conditions as he or she may determine appropriate; any such emergency measures so ordered and promulgated shall thereupon be in effect during the period of said emergency and in the area or areas for which the emergency has been declared:

. . .

>(8) The prohibition of the possession in a public place or park of weapons, including but not limited to firearms, bows and arrows, air rifles, slingshots, knives, razors, blackjacks, billy clubs, or missiles of any kind.

Code § 3-355.2(A), (B)(8). A violation of the Emergency Ordinance is a summary offense, subject to a fine of $50.00 to $1,000.00 and up to 90 days' imprisonment. Code §§ 3-355.99, 3-399.

[6] The Lost/Stolen Ordinance provides:

>A. Any person who is the owner of a firearm that is lost or stolen shall report the loss or theft of that firearm to an

Complaint, 1/16/15, at 9-13, ¶¶ 28-37; 18, ¶ 86.

FOAC, a statewide, non-partisan political action committee (PAC), averred that it has 1,649 members and actively works to "defend, preserve, and protect the constitutional and statutory rights of lawful firearm owners." *Id.* at 2-3, ¶ 3. FOAC alleged that one of its members was a City resident who was under the age of 18 and lawfully possessed firearms. *Id.* at 16, ¶ 60. Additionally, three individual members of FOAC were named plaintiffs in their individual capacities. Joshua First is a gun owner and City resident who fears prosecution under the ordinances. *Id.* at 17, ¶¶ 71, 72, 74. Howard Bullock is not a City resident but commutes daily to Harrisburg for work. *Id.* at 17, ¶ 79. Like First, Bullock lawfully possesses firearms and fears prosecution under the ordinances. *Id.* at 17, ¶¶ 77, 80. Kim Stolfer is a member and the president of FOAC. *Id.* at 16, ¶ 68. He does not live in Harrisburg but travels there regularly. *Id.* He too lawfully possesses firearms and fears criminal prosecution under the ordinances. *Id.* at 16, ¶ 66; 17, ¶ 69. Further, all three individual plaintiffs are licensed to carry concealed firearms in Pennsylvania. *Id.* at 18, ¶ 85.

---

appropriate local law enforcement official within 48 hours after discovery of the loss or theft[.]

B. For the purpose of this section, the term "firearm" shall be defined as any pistol or revolver with a barrel length less than 15 inches, any shotgun with a barrel length less than 18 inches or any rifle with a barrel length less than 16 inches, or any pistol, revolver, rifle or shotgun with an overall length of less than 26 inches. The barrel length of a firearm shall be determined by measuring from the muzzle of the barrel to the face of the closed action, bolt, or cylinder, whichever is applicable.

Code § 3-345.4. A violation of the Lost/Stolen Ordinance is a summary offense, subject to a fine of $50.00 to $1,000.00 and up to 90 days' imprisonment. Code §§ 3-345.99, 3-399.

Before filing their complaint, Appellees expressed to the City their concern that the challenged ordinances are unlawful and requested the City repeal them. *Id.* at 19, ¶ 89. However, on December 29, 2014, Mayor Papenfuse publicly declared his intent to continue to enforce the ordinances and his refusal to repeal them. *Id.* The Mayor was quoted in a news article as stating "[t]he city's not going to repeal its ordinances, because our police department feels that they are in the public interest, and I do too[.] . . . What responsible gun owner believes guns should be recklessly discharged within the city limits?" *Id.* at 19, ¶ 90; *id.* at Ex. B (attaching Christine Vendel, *Harrisburg stands firm on gun regulations despite threat of lawsuit*, PENNLIVE, Dec. 29, 2014, https://www.pennlive.com/midstate/2014/12/harrisburg_gun_regulations_law.html). Further, the same article reported that "Police Chief Tom Carter said officers regularly cite violators for reckless discharge of guns in the city and when minors are caught in possession of firearms. But he could not recall an instance where anyone was cited under the lost/stolen ordinance." *Id.* at 19, ¶ 91; *id.* at Ex. B. Additionally, in a January 5, 2015 article, Mayor Papenfuse confirmed that "[p]olice do cite people for [violating the Discharge Ordinance] on a regular basis. That is a sensible measure." *Id.* at 19, ¶ 92; *id.* at Ex. C (attaching Dave Marcheskie, *Harrisburg mayor fires back against gun ordinance legal threat*, ABC27, Jan. 5, 2015).

In their complaint, Appellees asserted that the challenged ordinances violate the Second Amendment of the United States Constitution ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed") and Article I, Section 21 of the Pennsylvania Constitution ("The right of the citizens to bear arms in defense of themselves and the State shall not be questioned."). *Id.* at 86. They also maintained that the ordinances are preempted by Section 6120 of the Pennsylvania Uniform Firearms Act (UFA), 18 Pa.C.S. §§ 6101-6128,

which provides that "No county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth."[7] 18 Pa.C.S. § 6120(a); Complaint, 1/16/15, at 86. Further, Appellees sought injunctive relief to require the City to repeal the challenged ordinances and to prevent the City from enforcing the challenged ordinances or enacting other firearms regulations. Complaint, 1/16/15, at 87.

On February 13, 2015, the City removed the case to the United States District Court for the Middle District of Pennsylvania (district court), which dismissed the suit for lack of subject matter jurisdiction on March 24, 2016, concluding Appellees lacked standing under federal law to challenge the ordinances. *Firearm Owners Against Crime v. City of Harrisburg*, No. 1:15-cv-0322, 2016 WL 1162283, at *9 (M.D. Pa. Mar. 24, 2016). On April 25, 2016, the district court remanded the case to the court of common pleas, which then sustained the City's preliminary objection in the nature of a demurrer and dismissed the complaint on October 9, 2018, based on Appellees' failure to plead sufficient facts to establish standing to sue. The court reasoned:

> [Appellees] have not pled any facts to show that they were harmed by any of the subject Ordinances. [Appellees] do not allege that they have ever been cited or personally threatened with citation under any of the Ordinances. Rather, [Appellees] assert potential harm that is entirely speculative, as it is based on events that may never occur. This is an improper use of the Declaratory Judgments Law. *See Gulnac by Gulnac v. S. Butler Cty. Sch. Dist.*, 526 Pa. 483, 488, 587 A.2d 699, 901 (1991) ("A declaratory judgment must not be employed to determine rights in anticipation of events which may never

---

[7] This Court subsequently held Act 192, which added to Section 6120 a provision giving standing to people adversely affected by local gun-control laws to bring an action against the municipality, was unconstitutional as it violated the single-subject rule and was void in its entirety. *Leach v. Commonwealth*, 141 A.3d 426, 435 (Pa. 2016). The general preemption provision of Section 6120(a) remains effective.

occur or for consideration of moot cases or as a medium for the rendition of an advisory opinion which may prove to be purely academic.") (citations omitted). As such, [Appellees] have failed to allege facts sufficient to establish standing, and this Complaint should be dismissed.

Trial Ct. Op., 10/9/18, at 4. Appellees appealed to the Commonwealth Court.

In a 6 to 1 en banc decision, the Commonwealth Court affirmed in part and reversed in part the trial court's order. *Firearm Owners Against Crime v. City of Harrisburg* (*FOAC*), 218 A.3d 497, 516 (Pa. Cmwlth. 2019) (en banc). The Commonwealth Court held Appellees had standing to challenge the Discharge, Lost/Stolen, Parks, and Minors Ordinances, but they did not have standing as to the State of Emergency Ordinance. *Id.* at 515. The court explained that "under a traditional standing analysis, the individual initiating the legal action must show that he is aggrieved by the matter he seeks to challenge", and that "[t]o be aggrieved, the party must have a substantial, direct and immediate interest in the outcome of the litigation[.]" *Id.* at 506. The court further elaborated:

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Id.* (quoting *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018) (en banc) (citations omitted)).

The Commonwealth Court held the individual Appellees had standing to challenge the Discharge, Parks, and Lost/Stolen Ordinances. *Id.* at 508-09. Applying the traditional standing analysis, the court concluded the individual Appellees' interest was substantial because each individual lived in, worked in, or regularly visited the City, and the ordinances restricted their lawful use and possession of firearms. *Id.* Further, their interest was direct as they established a causal connection between their use and

possession of firearms and the City's effort to restrict those activities by enforcing the ordinances. *Id.* Additionally, their interest was immediate because the ordinances presently curb their possession and use of firearms, and the City publicly indicated its active enforcement of the ordinances. *Id.* Accordingly, the individual Appellees had standing, and FOAC had associational standing because it alleged that at least one of its members suffered an immediate or threatened injury as a result of the action challenged. *Id.* at 508-09 (citing *Robinson Township v. Commonwealth*, 83 A.3d 901, 922 (Pa. 2013); *Ams. for Fair Treatment, Inc. v. Phila. Fed'n of Teachers*, 150 A.3d 528, 533 (Pa. Cmwlth. 2016)).

Regarding the challenges to the Minors Ordinance, the Commonwealth Court noted that FOAC was the only named plaintiff, and it alleged that it had members who were younger than 18, one of whom lived in the City and was subject to the ordinance. *Id.* at 510. The court held that FOAC had associational standing because the Minors Ordinance regulated one of its members and had a substantial, direct, and immediate effect on that member. *Id.* at 511.

In contrast, the Commonwealth Court concluded neither the individual Appellees nor FOAC had standing to challenge the State of Emergency Ordinance because that ordinance did not currently impose any duty or restriction on the ability to use or possess firearms within the City. *Id.* at 509. As the State of Emergency Ordinance requires the Mayor to declare a state of emergency before its provisions take effect, the court concluded "[Appellees] fail to allege any facts in their [c]omplaint under which we can conclude that this particular ordinance directly and immediately affects, regulates, or impairs the Individual [Appellees'] possession, use, or enjoyment of their firearms." *Id.* at 510 (citing *Gulnac by Gulnac*, 587 A.2d at 701). Because Appellees did not meet the traditional standing test, the Commonwealth Court considered whether they had standing

as taxpayers to challenge the State of Emergency Ordinance. *Id.* at 514. The court explained that to establish taxpayer standing, a plaintiff must show: "(1) the governmental action in question would otherwise go unchallenged; (2) those who are directly and immediately affected by the action complained of benefit from the action and thus are not inclined to challenge it; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other person is better suited to bring the challenge." *Id.* The court concluded Appellees did not meet this test because "there is no specific allegation in the [c]omplaint that the City is incurring any expense in the prosecution and enforcement of the State of Emergency Ordinance." *Id.* at 515. Because the ordinance was not enforceable unless the Mayor had declared a state of emergency, the court reasoned that "[t]he mere existence of the State of Emergency Ordinance, which imposes no stress on the City's coffers, poses no harm to First, Bullock, and FOAC's members *as taxpayers.*" *Id.* (emphasis in original). Accordingly, the court held they did not have taxpayer standing. *Id.*

The court recognized that affording traditional standing to the individual Appellees and FOAC conflicted with its precedent in *National Rifle Ass'n v. City of Philadelphia*, 977 A.2d 78 (Pa. Cmwlth. 2009), and *National Rifle Ass'n v. City of Pittsburgh*, 999 A.2d 1256 (Pa. Cmwlth. 2010), in which it "held that the plaintiffs in those cases lacked standing to challenge local gun ordinances because they failed to allege in their verified pleadings that they have actually violated the challenged ordinances, that they intend to violate the challenged ordinances, or that they have been prosecuted for violating the challenged ordinances." *FOAC*, 218 A.3d at 512. The court overruled the *NRA* cases based on this Court's decision in *Robinson Township*, which we decided after the *NRA* cases. *Id.* at 513. In *Robinson Township*, this Court reversed the Commonwealth Court's decision dismissing a physician's challenge to a statute restricting his ability to obtain and share

information with other physicians about chemicals used in fracking. *Robinson Twp.*, 83 A.3d at 923-25. The Commonwealth Court held that the physician would not have standing to challenge the statute unless he actually requested the confidential information, and his request was either denied, or his access to the information was restricted in such a way as to prevent him from providing care to his patient, or he actually possessed the information and wished to disclose it to others in violation of the statute's confidentiality provision. *Id.* at 923. In rejecting the Commonwealth Court's reasoning, this Court stated:

> [The physician] describes the untenable and objectionable position in which Act 13 places him: choosing between violating a Section 3222.1(b) confidentiality agreement and violating his legal and ethical obligations to treat a patient by accepted standards, or not taking a case and refusing a patient medical care. The Commonwealth's attempt to redefine [the physician's] interests and minimize the actual harm asserted is unpersuasive. Our existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide medical services to a patient, is equally undesirable. *See, e.g.*, *Cozen O'Connor v. City of Phila. Bd. of Ethics*, 13 A.3d 464 (Pa. 2011) (law firm has standing to test validity of Ethics Act provision in advance of undertaking potentially prohibited action where alternative is testing law by defying it and potentially damaging firm's ethical standing and reputation; third option of maintaining client debt on books for decades equally unappealing); *Shaulis v. Pa. State Ethics Comm'n*, 833 A.2d 123 (Pa. 2003) (attorney has standing to challenge statutory limitation on her practice of law in certain venues without taking prohibited action that would expose her to ethical investigation she was attempting to forestall; third option of foregoing practice in area of expertise equally unappealing); *see also Arsenal Coal Co. v. Commonwealth*, 477 A.2d 1333 (Pa. 1984) (pre-enforcement review of regulations is appropriate where lengthy process of addressing regulations' validity in enforcement action would result in ongoing uncertainty in industry and potential operational impediments and penalties).

> In light of [the physician's] unpalatable professional choices in the wake of Act 13, the interest he asserts is substantial and direct. Moreover, [the physician's] interest is not remote. A decision in this matter may well affect whether [the physician], and other medical professionals similarly situated, will accept patients and may affect subsequent medical decisions in treating patients—events which may occur well before the doctor is in a position to request information regarding the chemical composition of fracking fluid from a particular Marcellus Shale industrial operation. Additional factual development that would result from awaiting an actual request for information on behalf of a patient is not likely to shed more light upon the constitutional question of law presented by what is essentially a facial challenge to Section 3222.1(b).

*Id.* at 924-925.

The Commonwealth Court concluded that Appellees, who believe the ordinances violate their rights under the Unites States and Pennsylvania Constitutions had "no real alternative avenue to address their grievance." *FOAC*, 218 A.3d at 513. Like the physician in *Robinson Township*, they faced the equally unappealing options of "curb[ing] their conduct to conform to the ordinances' mandates or [] willfully violat[ing] the law and fac[ing] criminal prosecution." *FOAC*, 218 A.3d at 513. Accordingly, the Commonwealth Court overruled the *NRA* cases. *Id.*

Judge Patricia McCullough filed a concurring and dissenting opinion in which she disagreed with the majority's conclusion that Appellees did not have standing to challenge the State of Emergency Ordinance. *Id.* at 516 (McCullough, J., concurring and dissenting). Judge McCullough noted that Appellees alleged that they were subject to the ordinance during the pendency of this case, and they sought leave to amend the complaint to include those facts. *Id.* at 517. She opined that Appellees should be permitted to amend the complaint, and those facts would establish Appellees' standing. *Id.* Further, she disagreed that Appellees should have to wait until a state of emergency is declared to have standing. *Id.* at 519. Accordingly, Judge McCullough would have

granted standing to challenge the State of Emergency Ordinance, in addition to the four other ordinances. *Id.*

## II.  ISSUE AND STANDARD OF REVIEW

This Court granted the City's petition for allowance of appeal, limited to the following issue:

> Whether the Commonwealth Court's decision to grant Plaintiffs, who have not been cited under the City of Harrisburg's gun control ordinances and for whom any harm is remote and hypothetical, individual and associational standing to challenge the City of Harrisburg's gun control ordinances, directly conflicts with this Court's jurisprudence.

*Firearm Owners Against Crime v. Papenfuse*, 230 A.3d 1012 (Pa. 2020) (per curiam).[8]

This issue presents a question of law, over which our standard of review is de novo and our scope of review is plenary.  *Robinson Twp.*, 83 A.3d at 917.  Further, in addition to accepting all well-pled material facts in the complaint as true, we will affirm an order sustaining preliminary objections based on standing only if the plaintiff is clearly not entitled to relief as a matter of law.  *Id.*

## III.  INDIVIDUAL AND ASSOCIATIONAL STANDING

## A.  PARTIES' ARGUMENTS

The City contends that Appellees lacked individual or associational standing because they did not aver that they were arrested for violating the ordinances or that they changed their behavior to comply with the ordinances.  City's Brief at 11.  Due to the absence of allegations of actual or imminent injury, the City maintains Appellees' case is grounded on hypothetical future injuries that may never occur.  *Id.* at 14.  Because "[t]he 'keystone to standing . . . is that the person must be negatively impacted *in some real and*

---

[8] Appellees did not file a cross-appeal of the Commonwealth Court's decision that they lacked standing to challenge the State of Emergency Ordinance.  Accordingly, that issue is not before us in this appeal.  *See infra* n.13.

*direct fashion*,'" the City argues that Appellees' claims based on only potential future harm are insufficient to establish standing. *Id.* at 13-14 (quoting *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005) (emphasis added)). To illustrate its position, the City highlights that the Lost/Stolen Ordinance does not apply until a firearm is lost or stolen, and Appellees did not allege that any of them lost a firearm or had one stolen. *Id.* at 15. As such, the City argues Appellees do not have an "immediate" interest in the legality of the Lost/Stolen Ordinance. *Id.* Additionally, the City maintains Appellees' interest is not substantial because it is not different from the interest of anyone who lives in, works in, or travels to the City. *Id.* at 18 (citing *Fumo v. City of Phila.*, 972 A.2d 487, 496 (Pa. 2009) (explaining a plaintiff has a substantial interest "if his interest surpasses that of all citizens in procuring obedience to the law")). Because Appellees did not meet their burden of showing their interests surpass the interests of the general population, the City argues the Commonwealth Court erred in granting them standing. *Id.* at 19.[9]

---

[9] Amici Curiae CeaseFire Pennsylvania Education Fund and Giffords Law Center to Prevent Gun (collectively CeaseFire) Violence express concern that giving standing to Appellees, based on their fear of prosecution alone, would increase litigation against local governments and, in turn, serve to chill innovative local legislation. CeaseFire Amici Brief at 15-17.

Amici Curiae the County Commissioners Association of Pennsylvania, Pennsylvania Municipal League, Pennsylvania State Association of Township Supervisors, and Pennsylvania State Association of Boroughs (collectively Local Government Amici) argue that Appellees do not have standing because their complaint does not aver that the challenged ordinances have impaired their conduct in any manner and, thus, their interest in the ordinances' legality is no different from any other citizen. Local Government Amici Brief at 10-12. Moreover, they assert that standing in a declaratory judgment action requires a showing of imminent or inevitable litigation. *Id.* at 13.

Amici Curiae Cities of Philadelphia and Pittsburgh (collectively Amici Cities) agree Appellees do not have standing because they did not show a threat of enforcement or allege the ordinances regulate their behavior. Cities Amici Brief at 11-12. Specifically, Amici Cities note Appellees did not allege they will discharge a firearm within the City or its parks outside of an approved firing range; did not present facts about the prevalence

Regarding Mayor Papenfuse's public statements declaring his unwillingness to repeal the ordinances and his intent to continue enforcing them, the City argues those comments did not establish standing because they did not "indicate[] any immediate, concrete, intention to charge anyone, including these [Appellees], with violations of the Ordinances in question." *Id.* at 15-16. Thus, the City insists that Appellees' complaint did not state an "immediate, non-hypothetical harm" that rose to the level of an actual controversy to satisfy the test for standing. *Id.* at 16.

As it does not view Appellees' allegations as amounting to an "actual controversy," the City cautions that the Commonwealth Court's decision amounts to an impermissible advisory opinion. *Id.* The City explains that our refusal to sanction advisory opinions is consistent with our standing jurisprudence that requires a "real and concrete" controversy. *Id.* (quoting *City of Phila. v. Commonwealth*, 838 A.2d 566, 577 (Pa. 2003)). Further, the City asserts that advisory opinions are prohibited in declaratory judgment actions because the Declaratory Judgments Act "'requires a plaintiff to demonstrate an 'actual controversy' indicating imminent and inevitable litigation, and a direct, substantial and present interest.'" *Id.* at 17 (quoting *Cty. Comm'rs Ass'n of Pa. v. Dinges*, 935 A.2d 926, 931 (Pa. Cmwlth. 2007)). The City argues Appellees did not present an actual controversy and instead sought "pre-approval" of their intended conduct, which renders the Commonwealth Court's decision an erroneous advisory opinion. *Id.* at 17-18.

---

of loss or theft of firearms in their own experience or in their communities; and did not state whether FOAC's minor member possesses a firearm the Minors Ordinance bans, whether the minor is accompanied by an adult, or whether the in-residence possession exception applies. *Id.* at 14-17.

Appellees request that we strike these Amici briefs because they raise the issue of the financial implications on local governments. Appellees' Brief at 32-33. As discussed in note 11, *infra*, this issue is beyond the scope of our limited grant of allowance of appeal, and to the extent Amici discuss it, we will not consider it.

Moreover, the City contends the Commonwealth Court's decision in this case conflicts with this Court's decision in *Robinson Township*. *Id.* at 19. The City reads *Robinson Township* as a narrow ruling that "was limited to circumstances where an individual is presented with 'unpalatable professional choices,' between either abrogation of professional responsibility or violation of a statute." *Id.* at 20 (quoting *Robinson Twp.*, 83 A.3d at 924) (footnote omitted).[10] Seizing on the "unpalatable professional choices" language in *Robinson Township*, the City argues this case is distinguishable because Appellees, as firearms owners, did not have a "professional or ethical obligation" to act in a manner that would violate the challenged ordinances. *Id.* at 21. Further, the City maintains Appellees have not demonstrated actual harm, in the form of prosecution or threatened prosecution, unlike the physician in *Robinson Township* who we found showed actual harm. *Id.* Accordingly, the City asks us to clarify that *Robinson Township* does not give Appellees standing, contrary to the Commonwealth Court's conclusion. *Id.*[11]

Appellees respond that we should affirm the Commonwealth Court because the facts they pled, which we must credit as true when evaluating preliminary objections, establish their standing to bring a declaratory judgment action. Appellees' Brief at 21. Appellees interpret the Declaratory Judgments Act as liberally granting standing to a plaintiff whose rights are affected by a law, ordinance, regulation, policy, or rule. *Id.* at 16

_____

[10] Amici Cities and Local Government similarly interpret *Robinson Township* as limiting pre-enforcement actions to plaintiffs whose harm is related to its professional, legal, or ethical obligations. Local Government Amici Brief at 17; Cities Amici Brief at 7-8.

[11] The City persists with its argument that the Commonwealth Court's decision will open the floodgates to litigation, diverting local government resources to defending their laws. City's Brief at 22-23. As this line of argument is outside the scope of our limited grant of allowance of appeal, we decline to consider it. *Compare* Pet. for Allowance of Appeal, 724 MAL 2019, at 20-21, *with Firearm Owners Against Crime*, 230 A.3d at 1012; *see also Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1255 n.3 (Pa. 2006) (refusing to address issues beyond the scope of a limited grant of allowance of appeal).

(citing 42 Pa.C.S. §§ 7532, 7541). Nonetheless, to obtain standing, Appellees acknowledge they must show they are aggrieved by demonstrating their interest is direct, substantial, and immediate. *Id.* However, Appellees maintain that a plaintiff may have standing to bring a challenge to an ordinance before the ordinance is enforced against that plaintiff. *Id.* at 17. Such a "pre-enforcement" action is particularly appropriate, in Appellees' view, when no other adequate recourse exists. *Id.* at 18. Further, Appellees argue "[a] public threat of enforcement is enough to demonstrate 'the ripening seeds of a controversy sufficient to support judicial review.'" *Id.* at 17 (quoting *Wecht v. Roddey*, 815 A.2d 1146, 1150 (Pa. Cmwlth. 2002)).

Applying the traditional standing test, Appellees maintain they showed they are aggrieved because their interests are direct, substantial, and immediate. *Id.* at 22. Appellees assert their interests are direct because the challenged ordinances harm their "lawful ownership, possession, transport, transfer, and use of firearms in the City." *Id.* Further, Appellees contend their interests are substantial because the City's position is that they must either comply with the ordinances, thereby forfeiting their legal firearms rights, or challenge the ordinances during a criminal prosecution for violating the ordinances. *Id.* Appellees insist their interests exceed "the common interest of all citizens in securing compliance with the law" because not every citizen of the City engages in lawful firearms activities, and thus, the ordinances do not affect the conduct of every citizen of the City. *Id.* at 23. Lastly, Appellees argue their interests are immediate because the ordinances prohibit Appellees from engaging in a number of activities, including discharging firearms, even in self-defense; possessing firearms as a minor; carrying or discharging firearms in City parks; and impose on Appellees a duty to report a firearm as lost or stolen within 48 hours. *Id.* at 23-24. Appellees contend "the harm is

neither speculative nor remote simply because the Appellees have yet to face criminal prosecution." *Id.* at 24.[12]

Additionally, Appellees argue the Commonwealth Court did not issue an advisory opinion because they "are currently subject to restrictions and obligations imposed by the challenged ordinances and that harm is neither remote nor speculative." *Id.* at 25-26. Appellees posit that the Commonwealth Court's decision may have been advisory if the ordinances were proposed but not enacted; however, here, the City enacted the ordinances and was enforcing them. *Id.* at 26. Appellees disagree that they have to violate the ordinances to establish an "actual controversy" and note that the City provides no support for such a requirement. *Id.* Instead, Appellees maintain the Declaratory Judgments Act's purpose is to clarify legal rights and obligations without risking the consequences of violating the law. *Id.* at 27 (citing 42 Pa.C.S. § 7541(a)). Appellees note this Court's position has been that "'pure questions of law' like the constitutionality of the statutes underlying this matter 'are particularly well-suited for pre-enforcement review.'" *Id.* (quoting *Yocum v. Commonwealth Pa. Gaming Control Bd.*, 161 A.3d 228, 234 (Pa. 2017)). Appellees also suggest that "the factual development that would come

---

[12] Amicus Curiae the Republican Caucus of the Pennsylvania House of Representatives contend Appellees have standing because they are adversely affected by the Hobson's choice they face, *i.e.*, they may comply with the challenged ordinances, foregoing their asserted constitutional rights, or willfully violate the law and risk criminal prosecution. Republican Caucus Amicus Brief at 6-7. The remainder of the Caucus's amicus brief addresses the substantive issue of state preemption of local firearms regulations, which is beyond the scope of this appeal.

Similarly, Amici Curiae ACLU of Pennsylvania and Community Legal Services, Inc. urge us to apply our prudential standing cases to permit Appellees to seek pre-enforcement review of the challenged ordinances in order to "avoid putting plaintiffs to the choice between foregoing what they believe to be their constitutional right and suffering enforcement under the challenged ordinances." ACLU Amici Brief at 14. They further contend that the factual development is sufficient to facilitate judicial review. *Id.* at 15.

from forcing Appellees to violate the ordinances 'is not likely to shed more light upon the constitutional question of law.'" *Id.* (quoting *Robinson Twp.*, 83 A.3d at 925)).

Lastly, Appellees endorse the Commonwealth Court's decision to apply *Robinson Township* to this case. They note that the *Robinson Township* Court stated our "'jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide medical services to a patient, is equally undesirable.'" *Id.* at 28-29 (quoting *Robinson Twp.*, 83 A.3d at 924). Appellees disagree with the City's attempt to limit *Robinson Township* to situations involving an "unpalatable professional choice," noting that the *Robinson Township* Court reversed the Commonwealth Court's holding that the harm to the plaintiff-physician was too remote because he had not made the Hobson's choice before challenging the statute. *Id.* at 28 (citing *Robinson Twp.*, 83 A.3d at 923-925). Appellees maintain they "face equally unappealing options," like the physician in *Robinson Township*, and similarly have standing to challenge the City's ordinances. *Id.* at 29.[13]

In its reply brief, the City maintains that Appellees lack standing because their claims based on a "fear of prosecution" are too speculative and do not give them a

---

[13] Appellees additionally ask us to reverse the Commonwealth Court and find they have taxpayer standing to challenge all of the ordinances, including the State of Emergency Ordinance. Appellees' Brief at 30-32. However, Appellees did not appeal from the Commonwealth Court order affirming the trial court's decision to dismiss their challenge to the State of Emergency Ordinance because they did not have individual, associational, or taxpayer standing. *See also* City's Reply Brief at 10 (arguing Appellees waived their challenges to the State of Emergency Ordinance because they did not cross-appeal the Commonwealth Court's decision). Further, the issue of taxpayer standing is beyond the scope of our limited grant of allowance of appeal to consider Appellees' individual and associational standing. *Compare Firearm Owners Against Crime*, 230 A.3d at 1012 (limiting issues to individual and associational standing) *with Pittsburgh Palisades*, 888 A.2d at 661 (explaining taxpayer standing is an exception to traditional standing). Accordingly, we do not consider the issue of taxpayer standing.

substantial, direct, and immediate interest. City's Reply Brief at 1. The City reiterates that Appellees have not alleged "that they have violated the ordinances or intend to do so, received a warning for doing so, or were fined or otherwise summoned to court." *Id.* The absence of these allegations, in the City's view, means Appellees did not demonstrate immediate harm from the challenged ordinances. *Id.* at 3. Using Appellee Stolfer as an example, the City maintains Appellees' complaint does not show Stolfer is personally and directly impacted as it alleges only that Stolfer owns a gun and is subject to the ordinances but not that Stolfer intends to discharge a gun within the City, a park, or in any unlawful manner. *Id.* at 4. Further, the City disagrees that Mayor Papenfuse or Police Chief Carter's statements confer standing because they involve "general discussions of debates over the ordinances" and are over five years old. *Id.* at 5. Additionally, the City argues that all of Appellees' claims are dependent on third parties' exercise of discretion to enforce the ordinances, which renders the claims more speculative. *Id.*

The City also contends that a number of cases Appellees referenced in their brief support the City's position or are inapt. For instance, the City explains that in *Bliss Excavating Co. v. Luzerne County*, 211 A.2d 532 (Pa. 1965), this Court dismissed the landowners' challenge to the county's land use ordinances as "patently premature" and "an attempt to obtain an advisory opinion" because the county had neither charged any of the landowners nor threatened them with enforcement. *Id.* at 7 (quoting *Bliss*, 211 A.2d at 534). Similarly, the City notes that in *Dillon v. City of Erie*, 83 A.3d 467 (Pa. Cmwlth. 2013), the Commonwealth Court found the plaintiff lacked standing to challenge to a lost or stolen firearms ordinance because the plaintiff did not aver that he had lost his firearm or that the city would enforce the ordinance against him. *Id.* (citing *Dillon*, 83 A.3d at 474). Although the *Dillon* Court granted the plaintiff standing to challenge other ordinances

because city officials had personally warned the plaintiff of enforcement, the City distinguishes *Dillon* from this case because the City did not personally warn Appellees of potential enforcement actions. *Id.* Further, the City maintains Appellees cited a number of cases that involved claims of actual or immediate harm, which are readily distinguishable from this case. *Id.* at 8-9, 9 n.5 (discussing *Harris-Walsh v. Borough of Dickson City*, 216 A.2d 329, 330-31 (Pa. 1966) (deciding a court of equity had jurisdiction to decide validity of statute after the borough threatened plaintiff with criminal penalties); *Firearms Owners Against Crime v. Lower Merion Twp.*, 151 A.3d 1172, 1180 n.10 (Pa. Cmwlth. 2016) (containing dicta suggesting plaintiffs would have standing because the harm was not speculative); and *Wecht*, 815 A.2d at 1150 (involving an imminent violation of the Administrative Code and "inevitable" litigation)). Addressing Appellees' reliance on *Robinson Township*, the City asserts "owning a firearm is *not a profession*, and Plaintiffs face no comparable dilemma here." *Id.* at 9. The City argues that Appellees did not present any authority for the proposition that they have standing merely because they are "subject to" the challenged ordinances. *Id.*

## B. ANALYSIS

With the parties' arguments in mind, we first set forth our general standing jurisprudence. Standing is a justiciability concern, implicating a court's ability to adjudicate a matter. *See Robinson Twp.*, 83 A.3d at 916; *see also Town of McCandless v. McCandless Police Officers Ass'n*, 901 A.2d 991, 1002 (Pa. 2006) (explaining standing, ripeness, and mootness are related justiciability considerations that "are concerned with the proper timing of litigation."). Accordingly, a court must resolve justiciability concerns as a threshold matter before addressing the merits of the case. *Robinson Twp.*, 83 A.3d at 917. These justiciability doctrines ensure that courts do not issue inappropriate

advisory opinions. *See Stuckley v. Zoning Hearing Bd. of Newtown Twp.*, 79 A.3d 510, 516 (Pa. 2013).

The doctrine of standing "stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract." *City of Phila.*, 838 A.2d at 577. The touchstone of standing is "protect[ing] against improper plaintiffs." *In re Application of Biester*, 409 A.2d 848, 851 (Pa. 1979). To do so, courts require a plaintiff to demonstrate he or she has been "aggrieved" by the conduct he or she challenges. *In re Hickson*, 821 A.2d 1238, 1243 (Pa. 2003). To determine whether the plaintiff has been aggrieved, Pennsylvania courts traditionally examine whether the plaintiff's interest in the outcome of the lawsuit is substantial, direct, and immediate. *Robinson Twp.*, 83 A.3d at 917. "A party's interest is substantial when it surpasses the interest of all citizens in procuring obedience to the law; it is direct when the asserted violation shares a causal connection with the alleged harm; finally, a party's interest is immediate when the causal connection with the alleged harm is neither remote nor speculative." *Commonwealth, Office of Governor v. Donahue*, 98 A.3d 1223, 1229 (Pa. 2014).

Under Pennsylvania law, the doctrine of standing is "a prudential, judicially-created tool," affording discretion to courts. *See Hickson*, 821 A.2d at 1243; *see also Robinson Twp.*, 83 A.3d at 917 (standing "implicat[es] courts' self-imposed limitations"). "In the federal system, by contrast, standing is both constitutional, implicating Article III's case or controversy requirement, and prudential, involving judicial limits on federal jurisdiction." *Markham v. Wolf*, 136 A.3d 134, 140 n.8 (Pa. 2016).

Moreover, this Court has noted that the justiciability doctrines of standing and ripeness are closely related because both may encompass allegations that the plaintiff's harm is speculative or hypothetical and resolving the matter would constitute an advisory

opinion. *Robinson Twp.*, 83 A.3d at 917; *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 718 (Pa. 2009). However, ripeness is distinct from standing as it addresses whether the factual development is sufficient to facilitate a judicial decision. *Robinson Twp.*, 83 A.3d at 917.

Pursuant to these principles, our task in this case is to first decide whether Appellees are the proper plaintiffs in this declaratory judgment action, *i.e.*, whether they have a substantial, direct, and immediate interest in the constitutionality and preemption of the challenged ordinances. *See Donahue*, 98 A.3d at 1229 (recognizing that "[i]n order to sustain an action under the Declaratory Judgments Act, a plaintiff must allege an interest which is direct, substantial and immediate, and must demonstrate the existence of a real or actual controversy, as the courts of this Commonwealth are generally proscribed from rendering decisions in the abstract or issuing purely advisory opinions."). In the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541, the General Assembly vested in courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." 42 Pa.C.S. § 7532. Significantly, the legislature provided that the Declaratory Judgments Act is "remedial," and "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa.C.S. § 7541(a).

Applying the traditional substantial-direct-immediate test for standing, this Court has afforded standing to plaintiffs in pre-enforcement declaratory judgment actions challenging the legality or constitutionality of statutes. In *Cozen O'Connor*, this Court held Cozen O'Connor had standing to bring a declaratory judgment action against the City of Philadelphia and the Philadelphia Board of Ethics to determine whether it could forgive the $448,469.09 debt of its client, a political campaign committee, without violating the Philadelphia Code's $10,000.00 per year contribution limitation. *Cozen O'Connor*, 13

A.3d at 465. Before Cozen filed its action, the Ethics Board issued an opinion pursuant to the campaign committee's request, concluding that the Code prohibited contributions received after an election to settle campaign debt in excess of the $10,000.00. *Id.* at 466. This led Cozen to file a declaratory judgment action contesting the Ethics Board's interpretation of the Code, claiming that it improperly restricted Cozen's ability to forgive the committee's debt. *Id.* The trial court and the Commonwealth Court agreed with the City and the Ethics Board that Cozen did not have standing because it did not have a substantial, direct, and immediate interest and, thus, was not aggrieved by the Ethics Board's decision. *Id.* at 466-67.

On appeal, this Court found that Cozen had pled that it was unable to forgive the committee's debt without violating the Ethics Board's interpretation of the Code, even though it did not expressly plead that it intended to forgive the committee's debt. *Id.* at 472. Based on Cozen's averment that it could not forgive the debt without violating the Code, we "conclude[d] that the Firm possesses standing in this regard in that it has a substantial, direct, and immediate interest in knowing whether it may, in its own right, forgive the total outstanding debt owed to it by the Committee without running afoul of the Code's campaign contribution limitations, as interpreted by the Ethics Board, and, thereby face significant fines and sanctions for such violations." *Id.* at 472. Accordingly, this Court concluded the Ethics Board's decision aggrieved Cozen, giving Cozen standing to challenge it in a pre-enforcement declaratory judgment action. *Id.*

Similarly, as discussed previously, this Court in *Robinson Township* reversed the Commonwealth Court's holding that a physician did not have standing to bring a pre-enforcement declaratory judgment action challenging a portion of Act 13 restricting his ability to obtain and share information with other physicians about chemicals used in fracking unless he violated or intended to violate the statute. *Robinson Twp.*, 83 A.3d at

923. Because the statute placed the physician in the "untenable and objectionable" position of choosing between violating the statute, violating his legal and ethical obligations to his patient, or refusing to treat a patient, we concluded the physician's interest was substantial and direct, giving him standing to pursue pre-enforcement review. *Id.* at 924 (explaining "[o]ur existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option, here refusing to provide medical services to a patient, is equally undesirable."). Further, we rejected the Commonwealth Court's analysis that the physician did not have standing unless he violated or intended to violate the statute by noting "[a]dditional factual development that would result from awaiting an actual request for information on behalf of a patient is not likely to shed more light upon the constitutional question of law presented by what is essentially a facial challenge to [the statute]." *Id.* at 925.

In addition to the physician, the *Robinson Township* Court concluded two other entities had standing to challenge other aspects of Act 13: several municipalities and the Delaware Riverkeeper Network. *Id.* at 920-23. The Commonwealth Court below did not discuss these aspects of the *Robinson Township* decision. *Robinson Township* affirmed the Commonwealth Court's conclusion that a number of municipalities had standing to challenge Act 13 and their claims were ripe because, as the Commonwealth Court noted, "the townships would 'be forced to submit to the regulations [that required modification of their zoning codes] and incur cost[s] and burden[s] that the regulations would impose or be forced to defend themselves against sanctions for non-compliance with the law.'" *Id.* at 919 (alterations in original) (quoting *Robinson Twp. v. Commonwealth*, 52 A.3d 463, 479 n.17 (Pa. Cmwlth. 2012)). Moreover, the *Robinson Township* Court held the municipalities had standing because Act 13 implicated their constitutional duties and

governmental functions such that their interests were substantial, direct, and immediate. *Id.* at 920.

Additionally, the *Robinson Township* Court found the Delaware Riverkeeper Network had associational standing to challenge Act 13's constitutionality. The Court reasoned that the association's individual members "have a substantial and direct interest in the outcome of the litigation premised upon the serious risk of alteration in the physical nature of their respective political subdivisions and the components of their surrounding environment." *Id.* at 922. As the association's individual members had standing, this Court explained this gave the association standing because "an association has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged." 922. Accordingly, the *Robinson Township* Court found the physician, numerous municipalities, and an association had standing to challenge Act 13 in a pre-enforcement declaratory judgment action.

Likewise, in *Donahue*, this Court concluded the Office of the Governor had standing to bring a declaratory judgment action to challenge the Office of Open Records' interpretation of the Right-to-Know Law's timeframe for responding to written requests for documents. *Donahue*, 98 A.3d at 1225. The requester submitted a written request on March 7, 2012, which the Office of the Governor's open-records officer did not receive until March 12, 2012. *Id.* at 1226. Five business days later, on March 19, 2012, the officer granted the request in part and denied it in part. *Id.* The requester appealed to the Office of Open Records (OOR), and the OOR decided the request was deemed denied because the Office of the Governor did not timely respond within five business days of receiving the request, regardless of the five-day delay that occurred between the receipt of the request on March 7 and the transmission of the request to the open-records officer on

March 12. *Id.*; *see also* 65 P.S. § 67.901 ("If the agency fails to send the response within five business days of receipt of the written request for access, the written request for access shall be deemed denied."). Nonetheless, the OOR upheld the Office of the Governor's substantive response. *Donahue*, 98 A.3d at 1226.

The Office of the Governor then appealed the OOR's order to the Commonwealth Court, disputing the OOR's interpretation of the Right-to-Know Law's response period. *Id.* The Office of the Governor's position was that an agency's five-day response period begins to run only when the agency's open-records officer receives the request, and not any sooner if any other agency employee receives the request. *Id.*; *see also* 65 P.S. § 67.901 ("The time for response shall not exceed five business days from the date the written request is received by the open-records officer for an agency."). The Commonwealth Court quashed the appeal, holding that the Office of the Governor did not have standing because it was not aggrieved by the OOR's order. *Donahue*, 98 A.3d at 1226.

The Office of the Governor had also simultaneously filed a declaratory judgment action in the Commonwealth Court's original jurisdiction, seeking to clarify when the five-day response period began to run. *Id.* at 1226. The OOR filed preliminary objections, arguing the Office of the Governor did not have standing because it was not aggrieved in the underlying *Donohue* matter and lacked standing to litigate the same issue in a new declaratory judgment action. *Id.* at 1227. The Commonwealth Court, in a single-judge order, dismissed the OOR's preliminary objections to standing, and a three-judge panel agreed with the Office of the Governor's substantive interpretation of the law and thus granted declaratory relief. *Id.* at 1227-28.

On appeal, this Court held that the Office of the Governor had standing to bring a declaratory judgment action challenging the OOR's interpretation of the commencement

of the response period. *Id.* at 1230. Rejecting the OOR's argument that its interpretation of the response period did not harm the Office of the Governor's interests, this Court reasoned that the effect of the OOR's interpretation imposed a shortened response time that increased the likelihood of deemed denials, and, in turn, increased the amount of RTKL cases the Office of the Governor would have to adjudicate with the OOR. *Id.* (citing 65 P.S. § 67.1101 (providing a requester may appeal a deemed denial to the OOR)). Based on this, we concluded "[the Office of the Governor's] allegation of harm is neither remote nor speculative, and as an administrative agency of the Commonwealth charged with complying with the statutory directives of the RTKL, [the Office of the Governor] possesses a cognizable interest in the outcome of this dispute that surpasses the interest of all citizens." *Id.* Moreover, we rejected the OOR's position that the Office of the Governor was not aggrieved because the OOR had not engaged in official rulemaking. *Id.* Although this Court recognized the *Donahue* discussion of the response timeframe was "essentially dicta," we concluded that "OOR's initial adjudication in this matter and subsequent advocacy [indicating it intends to enforce its *Donahue* interpretation of the response period] serves to enunciate sufficiently its position on this issue which adversely, directly and immediately impacts OG." *Id.* This Court also noted that the foregoing analysis was consistent with our precedent granting standing to plaintiffs in declaratory judgment actions raising pre-enforcement challenges to an administrative agency's interpretation and enforcement of a statute. *Id.* (citing *Arsenal Coal*, 477 A.3d at 1333; *Bayada Nurses, Inc. v. Commonwealth*, 8 A.3d 866 (Pa. 2010)).

Most recently, in *Yocum,* this Court held an attorney employed by the Pennsylvania Gaming Control Board had standing to bring an action for declaratory and injunctive relief challenging the constitutionality of restrictions the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §§ 1101-1904, imposed on the

Board's employees. *Yocum*, 161 A.3d at 231. Claiming that she wanted "to seek and accept new employment as an attorney representing gaming clients," which would potentially violate the Gaming Act's employment restrictions in Section 1208(h), the attorney sought a declaratory judgment that Section 1208(h) was an unconstitutional restriction on the practice of law. *Id.* at 232-33; *see also* Pa. Const. Art. V, § 10 (granting the Supreme Court the exclusive authority to regulate the practice of law). The attorney elaborated that the Gaming Act imposed on her two equally unappealing options: either violate the Gaming Act in order to contest the Act's constitutionality, which would put at risk her ability to continue practicing law and put her affiliates in jeopardy of administrative penalty; or refrain from practicing law in the area of her expertise in order to comply with the Gaming Act. *Yocum*, 161 A.3d at 233. The Board filed preliminary objections, arguing, in part, she did not have standing because the Board still employed her and she had not been aggrieved by the Gaming Act's employment restrictions and, relatedly, her claims were not ripe because enforcement of the employment restrictions was hypothetical and speculative. *Id.*

This Court concluded she had standing to challenge the constitutionality of the Gaming Act's employment restrictions because the attorney would violate the Gaming Act by attempting to obtain new employment in the gaming industry, which would expose her and her potential employer to adverse consequences. *Id.* at 237. Moreover, we concluded the attorney's claim was ripe because she presented a constitutional question of law and "additional factual development of petitioner's claims that might result from awaiting her actual application to or recruitment by a possible future gaming industry employer 'is not likely to shed more light upon the constitutional question of law' she has

presented[. . ., which was] 'particularly well-suited for pre-enforcement review.'" *Id.* (quoting *Robinson Twp.*, 83 A.3d at 917, 925).[14]

This line of cases – *Cozen O'Connor*, *Robinson Township*, *Donahue*, and *Yocum* – departed from this Court's earlier decision in *Pittsburgh Palisades* in which we sustained preliminary objections to standing in a pre-enforcement declaratory judgment action because the petitioners' claims were "wholly contingent on future events." *Pittsburgh Palisades*, 888 A.2d at 660. In *Pittsburgh Palisades*, this Court concluded the petitioners, Pittsburgh Palisades Park, LLC and Charles J. Betters, did not have standing to bring a

---

[14] This Court has also permitted plaintiffs to seek pre-enforcement relief when a law imposed unappealing options in cases that were not brought under the Declaratory Judgments Act. In *Arsenal Coal*, this Court held that the petitioners' petition for pre-enforcement injunctive relief from the Department of Environmental Resources' regulatory scheme presented a justiciable claim. *Arsenal Coal*, 477 A.2d at 1338, 1340. In reversing the Commonwealth Court's decision that equitable relief was unavailable because the statutory administrative review provisions provided an adequate remedy, the *Arsenal Coal* Court concluded that the regulations had a direct and immediate impact on the petitioners, creating an exception to the general rule of exhaustion of administrative remedies. *Id.* at 1340. This Court further explained that if petitioners were unable to obtain pre-enforcement review, their alternative options were to refuse to comply with the regulations to test them, risking sanctions and the uncertainty of piecemeal litigation, or to comply with the regulations, which would be expensive. *Id.* In light of the inadequacy of these alternatives and the direct and immediate impact on the petitioners, this Court concluded the petitioners were entitled to pre-enforcement review. *Id.*

In *Shaulis*, this Court held that an attorney, previously employed by the Department of Revenue, had standing to bring a constitutional challenge to a provision of the Public Official and Employee Ethics Act that the State Ethics Commission had determined prevented her, as a former government employee, from engaging in certain aspects of private practice that would involve the Department. *Shaulis*, 833 A.2d at 125, 127, *abrogated in part by Yocum*, 161 A.3d at 237. This Court found that the Ethics Act gave statutory standing to a person aggrieved by a final opinion of the Commission. *Id.* at 129. The *Shaulis* Court reasoned that the attorney was aggrieved because the choice that resulted from the Commission's opinion was either to accept the Commission's opinion and forego aspects of her legal practice or violate the Commission's interpretation of the Ethics Act and risk the consequences in order to challenge it in court. *Id.* at 130. Accordingly, this Court held she was aggrieved for the purposes of the Ethics Act because she had a direct interest in the opinion and had standing under the Ethics Act to bring a pre-enforcement challenge to the Commission's opinion. *Id.*

declaratory judgment action challenging the constitutionality of the Pennsylvania Race Horse Development and Gaming Act. *Id.* at 657. The petitioners' claim was based on their averments that they had acquired property in Pittsburgh on which they planned to develop a gaming facility and intended to apply for a gaming license once the Pennsylvania Gaming Control Board established the application process. *Id.* The petitioners asserted that Section 1209 of the Gaming Act, which provided for a refund of slot machine license fees if the Board changed in certain ways, prohibited the General Assembly from altering certain provisions of the Gaming Act in violation of Article II, Section 1 of the Pennsylvania Constitution, which vests exclusive legislative power in the General Assembly. *Id.* at 658. Based on this, the petitioners sought to invalidate the Gaming Act and preclude the Board from issuing licenses. *Id.*

Acting in our original jurisdiction, this Court sustained the respondents' preliminary objections to the petitioners' standing. This Court reasoned that the petitioners' harm was not substantial because they failed to demonstrate an interest in the constitutionality of Section 1209 "that is greater than that of any other citizen." *Id.* at 660. Further, we found their interest was not direct because "not only do [the petitioners] themselves strongly suggest that Section 1209 would only work to their benefit in terms of a refund if the Board was changed, but also at this juncture they have not been issued a gaming license and there have been no allegations that legislators have been 'handcuffed' by the prospect of returning gaming fees." *Id.* Because the harm to the petitioners was "wholly contingent on future events," we concluded their interest was not immediate. *Id.* As the petitioners did not demonstrate a direct, substantial, or immediate interest, we held they did not have standing. *Id.* at 660-61.

In dissent, Justice Saylor commented on the "widening tension" between the Declaratory Judgments Act, which courts are directed to liberally apply to resolve

uncertainty regarding rights, and a strict application of the traditional standing requirements of a substantial, direct, and immediate interest. *Id.* at 663 (Saylor, J., dissenting). Justice Saylor advocated a relaxed immediacy requirement in declaratory judgment cases. *Id.* (relying on *Petition of Kariher*, 131 A. 265, 268 (Pa. 1925)). Accordingly, he proposed directing the Commonwealth Court to conduct an evidentiary hearing, and ultimately grant standing if the petitioners showed a likelihood of both meeting the criteria for a gaming license and filing an application for a license. *Id.*

Guided by *Cozen O'Connor*, *Robinson Township*, *Donahue*, and *Yocum*, we conclude the averments in Appellees' complaint are sufficient to establish their standing to bring a declaratory judgment action challenging the constitutionality and statutory preemption of the City's Discharge, Parks, Lost/Stolen, and Minors Ordinances. The complaint alleges that First, Bullock, and Stolfer lawfully possess firearms, are licensed to carry a concealed firearm, and fear criminal prosecution under the ordinances as they live, commute, and travel to the City. Complaint, 1/16/15, at ¶¶ 66, 68, 69, 71, 72, 74, 77, 79, 80, 85. Additionally, one of FOAC's members is under the age of 18, resides in the City, and lawfully possesses firearms. *Id.* at ¶ 60. Further, the City is actively enforcing the ordinances, citing violators of the Discharge and Minors Ordinances, and the City's mayor indicated his intent to continue to enforce the ordinances. *Id.* at Ex. B; Ex. C.

Given these allegations, which we take as true, Appellees currently must make a choice to either comply with the ordinances, thereby forfeiting what they view as their constitutionally and statutorily protected firearms rights; or violate the ordinances by exercising their rights, thereby risking criminal prosecution. Appellees also have a third option, which is to stop living in, commuting to, or travelling to the City to avoid being subject to its ordinances, which would of course entail relocating from the City, changing employers, or foregoing legislative advocacy. That Appellees are confronted with these

options shows that their interest in the outcome of the constitutionality and preemption of the challenged ordinances is substantial, immediate, and direct. *Accord Yocum*, 161 A.3d at 237; *Robinson Twp.*, 83 A.3d at 924-25; *Cozen O'Connor*, 13 A.3d at 472. The individual Appellees' interest is substantial because they, as lawful possessors of firearms and concealed carry licenses, seek a determination of the validity of the City's Discharge, Parks, and Lost/Stolen Ordinances, which criminalize aspects of their ability to carry and use firearms within the City and impose reporting obligations for lost or stolen firearms. This exceeds the "abstract interest of all citizens in having others comply with the law." *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 282 (Pa. 1975) (defining substantial interest). Their interest is direct because the challenged ordinances allegedly infringe on their constitutional and statutory rights to possess, carry, and use firearms within the City. *See id.* (stating a direct interest "simply means that the person claiming to be aggrieved must show causation of the harm to his [or her] interest by the matter of which he [or she] complains."). Their interest is immediate because they are currently subject to the challenged ordinances, which the City is actively enforcing, and must presently decide whether to violate the ordinances, forfeit their rights to comply with the ordinances, or avoid the City altogether. This alleged harm to their interest is not remote or speculative. *See Donahue*, 98 A.3d at 1229. Because the individual Appellees, who are all members of FOAC, have standing to challenge the Discharge, Parks, and Lost/Stolen Ordinances, FOAC has standing as an associational representative of these members to challenge the ordinances. *See Robinson Twp.*, 83 A.3d at 922. For the same reasons, FOAC's member who is a minor and resides in the City has a substantial, direct, and immediate interest in the outcome of this matter, and FOAC also has standing as this minor's associational representative to challenge the Minor's Ordinance. *See id.* Accordingly, Appellees have a substantial, direct, and immediate interest in the outcome

of their challenge to the ordinances and have standing to pursue a declaratory judgment action to ascertain their rights and obligations.

Based on the above, the City's argument that Appellees do not have a substantial interest because it is the same as anyone who is present in the City is unpersuasive. On the contrary, Appellees' interest is greater than citizens who do not own or possess firearms within the City. Appellees' conduct is currently regulated by the challenged ordinances, and their interest in the outcome of this action clearly surpasses that of every other citizen. *See Donahue*, 98 A.3d at 1229 (concluding the Office of the Governor's interest surpassed the interest of all citizens because it had to comply with the RTKL response time). Additionally, we reject the City's position that Appellees do not have an immediate interest. Similar to the Office of the Governor in *Donahue*, whose interest was immediate because of the effect of the OOR's interpretation on its RTKL response obligations, Appellees have an immediate interest because of the effect of the challenged ordinances on their exercise of their firearms rights. *See id.* Appellees' interest in this matter is immediate because the resolution of the underlying constitutional and statutory challenges will impact whether they must comply with the ordinances. Just as the Office of the Governor's allegation of harm was not remote or speculative in *Donahue*, neither is Appellees' allegation of harm in this case. *See id.*

We also reject the City's contention that Appellees' harm is hypothetical and not immediate because they did not aver that they have been arrested, threatened with citation, or that they changed their behavior to comply with the ordinances, and the mayor's statements did not threaten any specific individuals with citation.[15] First, our

---

[15] Although we recognize that the City's line of arguments raises classic ripeness concerns in the form of the lack of factual development, and ripeness is generally waived if the parties do not raise it, *see Rendell*, 983 A.2d at 718, we decline to find the claims waived because of the inherent interrelatedness of standing and ripeness. *See Robinson*

jurisprudence in pre-enforcement declaratory judgment cases, as discussed above, has developed to give standing to plaintiffs to challenge laws before the laws have been enforced against them and before enforcement has been threatened. *See Yocum*, 161 A.3d at 237; *Donahue*, 98 A.3d at 1230-31; *Robinson Twp.*, 83 A.3d at 920, 922-25; *Cozen O'Connor*, 13 A.3d at 471-72. Second, as Appellees contest the facial validity of the ordinances, "[a]dditional factual development that would result from awaiting an actual [criminal prosecution] is not likely to shed more light upon the constitutional question of law presented[.]" *Robinson Twp.*, 83 A.3d at 925; *accord Yocum*, 161 A.3d at 237. From the facts Appellees pled in their complaint, we can reasonably infer that they seek to conduct various activities with firearms within the City, which subjects them to potential enforcement actions. *See Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1022 (Pa. 2019) (stating a court reviewing a ruling on preliminary objections accepts as true all reasonable inferences from the material facts averred in the complaint). Third, the mayor's and police chief's statements indicate that they are enforcing the ordinances, intend to continue to do so, and will not repeal the ordinances. That is sufficient to define the City's officials' position on the ordinances and shows the substantial, direct, and immediate risk of criminal prosecution to Appellees if they do not comply with the ordinances. *Cf. Donahue*, 98 A.3d at 1229 (concluding "OOR's initial adjudication in this matter and subsequent advocacy serves to enunciate sufficiently its position on this issue which adversely, directly and immediately impacts [the Office of the Governor]."). It is not necessary for the mayor or police chief to specifically threaten any individual with enforcement as Appellees' interests are immediate without that factual

---

*Twp.*, 83 A.3d at 917. Accordingly, we address the City's arguments as implicating the immediacy of Appellees' interest for standing purposes.

development, and it would not assist the legal inquiry into the validity of the ordinances. *See Robinson Twp.*, 83 A.3d at 925.

Moreover, our decision in this matter is consistent with *Cozen O'Connor*, *Robinson Township*, and *Yocum*. As outlined above, the challenged ordinances put Appellees in the position that this Court has held is "particularly well-suited for pre-enforcement review" in a declaratory judgment action. *Robinson Twp.*, 83 A.3d at 917, 924. Similar to the municipalities in *Robinson Township*, which alleged Act 13 interfered with their constitutional duties regarding the environment, Appellees assert the City's ordinances impair their constitutional rights to possess and use firearms and their statutory rights to be free from municipal firearms regulations. *See Robinson Twp.*, 83 A.3d at 920. Further, like the physician in *Robinson Township*, who had to choose between violating Act 13, violating his legal and ethical obligations in treating patients, or refusing a patient medical care, Appellees here must choose whether to violate the challenged ordinances, surrender their constitutional and statutory rights, or avoid the City. *See id.* at 924. As the *Robinson Township* Court stated, "[o]ur existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between" relinquishing their rights to comply with a law or willfully violating the law.[16] *See id.*

Further, like the law firm in *Cozen O'Connor* that was unable to forgive its client's debt unless it violated the Ethics Board's interpretation of campaign contribution

---

[16] *Robinson Township* contained shorthand language to describe the circumstance where a law forces a plaintiff to make a choice between complying with a law, which would violate other obligations, or violating the law. *See Robinson Twp.*, 83 A.3d at 924 (characterizing the physician's situation as "untenable," "objectionable," "unappealing," and "undesirable"). We clarify that Appellees have standing because the challenged ordinances place them in the position of choosing to violate the ordinances by exercising their perceived constitutional and statutory rights or to comply with the City's laws and forfeit those asserted rights.

limitations, Appellees here cannot exercise their firearms rights without potentially violating the City's ordinances. *See Cozen O'Connor*, 13 A.3d at 472. Just as the law firm had a substantial, direct, and immediate interest in obtaining a declaratory judgment as to its right to forgive the debt without violating the law, Appellees in this case have a substantial, direct, and immediate interest in knowing whether they will face potential criminal prosecution in possessing or using firearms in the City or not reporting their firearms lost or stolen. *See id.* Moreover, comparable to the attorney in *Yocum*, who had standing to challenge the Gaming Act's employment restrictions because she was compelled to either violate the Act, forgo obtaining new employment in the gaming industry, or search for employment outside of her area of expertise, Appellees have standing to challenge the City's ordinances based on the position in which the ordinances place them. *See Yocum*, 161 A.3d at 237. In these cases, this Court concluded plaintiffs have standing to challenge laws via declaratory judgment actions when they are confronted with a choice between complying with the law or forfeiting their claimed rights, even though they do not face an enforcement action or the threat of one.

We reject the City's suggestion that these cases must be read as narrowly applying to choices that arise only in the occupational or industry context. It is true that this line of pre-enforcement declaratory judgment cases have arisen in that context, as the law in *Robinson Township* regulated the physician's professional obligations, the law in *Yocum* restricted the attorney's employment opportunities, and the law in *Cozen O'Connor* affected the firm's ability to forgive debt. Here, that is not the context as the challenged ordinances regulate constitutionally and statutorily protected individual rights. However, the City offers no workable limiting principle, and we cannot discern any reason to limit standing in pre-enforcement declaratory judgments to those areas as long as the plaintiff demonstrates it is aggrieved in that its interest is substantial, direct, and immediate.

There is no basis to constrain the power granted by the Declaratory Judgments Act. The Declaratory Judgments Act gives courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." 42 Pa.C.S. § 7532. The Act refers to the "rights, status, and other legal relations" without qualification and does not limit it to the occupational or business arena. *Id.* The Declaratory Judgments Act provides an avenue of relief for a plaintiff to determine its rights when a law forces upon the plaintiff a number of choices, including surrendering perceived rights to comply with the law. That is the case here as Appellees must choose to comply with the ordinances and forfeit their firearms rights, to violate the ordinances and risk criminal prosecution, or to avoid being present in the City. Therefore, Appellees are aggrieved by the ordinances and are the proper plaintiffs to pursue this declaratory judgment action.

For the foregoing reasons, we conclude Appellees have individual and associational standing to seek declaratory relief from the Discharge, Parks, Lost/Stolen, and Minors Ordinances. Accordingly, we affirm the order of the Commonwealth Court. Jurisdiction relinquished.

Justices Saylor, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Baer files a dissenting opinion in which Justices Todd and Donohue join.

Justice Donohue files a dissenting opinion in which Chief Justice Baer and Justice Todd join.